885 P.2d 99

**KARBER/INTERSTATE AIR, Petitioner Employer,**

**Argonaut Insurance Company, Petitioner Carrier,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Robert Nixon, Respondent Employee.**

No. 1 CA–IC 92–0212.

Court of Appeals of Arizona, Division 1, Department C.

March 17, 1994.

Reconsideration Denied May 27, 1994.

Review Denied Dec. 20, 1994.

Long, Lester & Lundmark by Steven C. Lester, Phoenix, for petitioner employer and carrier.

Anita R. Valainis, Chief Counsel, the Indust. Com'n of Arizona, Phoenix, for respondent.

Stephen L. Weiss, Phoenix, for respondent employee.

## OPINION

TOCI, Presiding Judge.

The employer, Karber/Interstate Air, and carrier, Argonaut Insurance Company ("Argonaut"), bring this special action review of an Industrial Commission award. Robert Nixon ("claimant") tripped on an expansion strip in his parents' driveway while under treatment for an industrial injury to his right knee. Although the right knee injury itself did not cause claimant to trip, he tried to protect his vulnerable right knee from further injury by placing his full weight on his left leg. The left leg gave way, and claimant fell on it, tearing the anterior cruciate ligament in his left knee. Accepting the medical opinion of claimant's doctor, the administrative law judge ("ALJ") found that claimant suffered an acute left knee injury. The ALJ concluded that the left knee injury was a compensable consequence of the industrial injury.

We conclude that the ALJ erred in finding that medical causation alone was sufficient to support the award. Nevertheless, when we apply the proper legal test for causation, the record compels only one conclusion—that the later injury to the left knee is a compensable consequence of the work injury. Therefore, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

In June 1991, claimant, a sheet-metal mechanic, sustained a work-related injury to his right knee. Eli Krigsten, M.D., an orthopedic surgeon, examined the knee and found that claimant had torn his medial and lateral menisci and his anterior cruciate ligament. Claimant filed a workers' compensation claim, and Argonaut accepted liability.

In July and August 1991, Dr. Krigsten performed arthroscopic surgery on claimant's right knee. He repaired the torn medial and lateral menisci and reconstructed the torn anterior cruciate ligament. He later examined the knee on February 11, 1992, and found that it was not yet medically stationary. During the examination, he also noted that claimant's right knee pain was interfering with claimant's right knee physical therapy.

On February 17, 1992, claimant injured his left knee. The next day, Dr. Krigsten examined claimant's left knee and reported the following history: Claimant "was walking in his driveway the other day when he slipped and his left knee gave out as he landed onto it." When Dr. Krigsten arthroscopically examined claimant's left knee, he discovered a completely torn anterior cruciate ligament that had attached itself to the posterior cruciate ligament. After the examination, he wrote a letter to Argonaut expressing his opinion that the left knee injury "was in fact as a result and secondary to his industrial injury previously operated upon." Benefits for the left knee injury were denied by Argonaut. Claimant then retained counsel and protested the denial of benefits.

After claimant's protest, Argonaut scheduled an independent examination with Alfred F. Miller, M.D. In his report of August 18, 1992, Dr. Miller stated that the anterior cruciate ligament tear probably preexisted the driveway trip and fall of February 17, 1992. He concluded that the left knee injury was not related to the industrial right knee injury.

At the hearing, claimant testified that while wearing his right knee brace he walked up his parents' driveway, caught his right foot on an expansion joint, and tripped. The evidence is undisputed that the right knee injury did not cause the claimant to trip. Nevertheless, claimant was attempting to protect his industrially injured right knee from further injury when he injured his left knee. In claimant's words, "So, when it happened, and protecting this leg [right leg], I put the full force of my weight onto the left leg, and when I did, [the left knee] kind of gave out on me ... and I fell on it ... real hard."

Claimant also testified that while playing softball in 1985 or 1986, he twisted his left

knee, resulting in some swelling and soreness. Because of the softball injury, claimant missed one week of work and began physical therapy. After the softball injury healed, claimant worked and played sports without any problems until the June 1991 industrial injury.

Dr. Krigsten testified on behalf of claimant at the hearing. He stated that the driveway trip and fall left claimant with a significant left knee injury. Krigsten reached this conclusion because claimant had no prior history of significant left knee injuries and the ligament and menisci tears appeared to be acute.[1] The doctor connected the left knee injury to the industrial injury because claimant had intentionally landed on his left leg to protect his vulnerable right knee from further injury. On cross-examination, Dr. Krigsten conceded that claimant might have had a preexisting partial anterior cruciate ligament tear and that a sports injury could have caused such tear. Nevertheless, Dr. Krigsten testified that even if claimant had a preexisting partial tear of the ligament, the February 1992 trip and fall significantly aggravated the injury.

Dr. Miller, appearing on behalf of Argonaut, testified that claimant's left knee collapsed because claimant probably had a preexisting anterior cruciate ligament tear. Dr. Miller further stated that a cruciate ligament tear usually requires an injury more severe than merely falling on a leg. According to Dr. Miller, only an old tear could have caused the anterior cruciate ligament to attach itself to the posterior cruciate ligament; a new tear would have caused a bloody effusion, which Dr. Krigsten did not report finding on the initial examination. Dr. Miller also testified that after the acute symptoms resolve, a person could do heavy work despite having a torn anterior cruciate ligament.

Following the hearing, the ALJ issued an award imposing liability on Argonaut for the left knee injury. The ALJ's dispositive findings state:

1. The issue in this case is whether applicant's left knee condition is a compensable consequence of his industrial injury. The law of compensable consequence was recently defined in *Lou Grubb Chevrolet, Inc. v. Industrial Commission,* [174 Ariz. 23, 26, 846 P.2d 836, 839 (App.1992) ], as follows:

"[A] subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury." ... [I]f the claimant's conduct is reasonable, a new injury or aggravation is a direct and natural result of an industrial injury if the industrial injury predisposed a claimant to further injury.... [I]n some cases the link between a primary injury and the subsequent injury may be too weak to be compensable.... While workers' compensation laws are generally to be construed liberally in favor of the employee, a line must be drawn somewhere in cases involving later injuries. Otherwise, an employer who has discharged his obligation as to the original injury will become an insurer of every recurrence of the original injury. Thus, there must be a substantial causal relationship between the industrial injury and the later disability or need for treatment. *See Mercante [v. Industrial Com'n of Ariz.],* 153 Ariz. [261] at 265, 735 P.2d [1384] at 1388. If there is no such relationship, the later injury is beyond the range of compensable consequences of the primary industrial injury.

....

5. In applying the law to the present case, the issue is whether the left knee condition is a direct and natural result of the industrial injury. The first question is whether the industrial injury predisposed applicant to further injury. Both applicant and Dr. Krigsten testified that at the time of the driveway incident in February, 1992, applicant's right knee condition had not stabilized. Applicant's right knee was

---

1. Although claimant testified that the 1986 left knee injury later caused him "many significant problems," Dr. Krigsten testified that before the June 1991 industrial injury, claimant had never complained of left knee problems nor did he have any history of significant left knee problems.

weakened and still painful. Applicant testified that when he slipped, he tried to protect the right knee and landed with full force on the left knee, causing it to collapse. Applicant's statement that he tried to protect the right knee was not contradicted by any other witness, expert or otherwise, and therefore, it is found to be credible. Based upon the foregoing, the undersigned finds that the industrial injury predisposed applicant to further injury.

6. The second question is whether there is a substantial causal relationship between the industrial injury and the left knee condition and need for treatment. There is a conflict in the evidence between the opinions of Doctors Krigsten and Miller . . . .

7. If the expert evidence is in conflict, it is the responsibility of the Administrative Law Judge to resolve it. The undersigned resolves this conflict by adopting the opinion of Dr. Krigsten as being probably more correct and well founded. Thus, there is a substantial causal relationship between the industrial injury and the left knee condition and the need for treatment. It is therefore found that applicant's left knee condition is a compensable consequence of the industrial injury.

(Citations omitted.)

On administrative review, Argonaut asserted that the ALJ had misapplied the "direct and natural result" test. It argued that (1) finding 5 is immaterial because a predisposition to injury bears on compensability only if the subsequent event aggravates the industrial injury, and (2) that the "direct and natural result" test is a test of legal causation and that findings 6 and 7 mistakenly reduce such test to one of medical causation alone. This special action followed.

## II. DISCUSSION

■ In *Lou Grubb Chevrolet, Inc. v. Industrial Comm'n,* 174 Ariz. 23, 846 P.2d 836 (App.1992), we stated the applicable test where a later injury is claimed to be a compensable consequence of a prior industrial injury. We said, "'[a] subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable

if it is the *direct and natural result* of a compensable primary injury.'" *Id.* at 26, 846 P.2d at 839 (quoting 1 Arthur Larson, *The Law of Workmen's Compensation,* § 13.11 at 3–503 (1990)). A later injury is the direct and natural result of the primary compensable injury if a substantial causal relationship exists between the two injuries. *Lou Grubb,* 174 Ariz. at 26, 846 P.2d at 839. The direct and natural result test is not exclusively a medical issue. *Id.* at 28, 846 P.2d at 841. Even where medical causation exists, if the link between the primary industrial injury and the later injury is too weak, the later injury is beyond the range of compensable consequences of the industrial injury. *See id.*

In this case, although the ALJ cited the correct test, she failed to properly apply it. In finding number 7, the ALJ found a substantial causal relationship between the industrial injury and the left knee injury. This finding is based solely upon her resolution of the conflicting medical evidence in favor of claimant's orthopedist, Dr. Krigsten. This was insufficient. Medical causation is required, but it is not the exclusive element in determining whether a substantial causal relationship exists between the work injury and the later injury. The ALJ failed to address legal causation—whether as a matter of policy, the causal connection between the two injuries is strong enough for the left knee injury to be a compensable consequence of the industrial injury.

■ Argonaut contends that because of the ALJ's error, we must set aside the award. We disagree. Even if the ALJ applied the wrong legal test, we must affirm an Industrial Commission award if, under the correct test, the record supports only one conclusion. *See ITT Courier v. Industrial Comm'n,* 141 Ariz. 357, 360, 687 P.2d 365, 368 (App.1984). Here, Argonaut neither disputed claimant's version of how the injury occurred nor challenged the ALJ's finding that claimant injured his left knee while trying to protect his industrially injured right knee. Consequently, this record compels only one conclusion—that the later injury to the left

knee is a compensable consequence of the work injury.

We now turn to Argonaut's first argument: that because claimant injured his left knee and not the vulnerable right knee, the ALJ's finding number 5, (that claimant's right knee was predisposed to further injury), is immaterial to the resolution of this case. We agree that the predisposition issue usually arises where the later injury affects a part of the body predisposed by the work injury to further injury. *See generally Lou Grubb.* And here, claimant's industrially injured right knee was not affected by the trip and fall. Nevertheless, the predisposition of claimant's right knee to further injury was relevant. It became so when claimant explained that he·fell with his full weight on the left leg to protect his vulnerable right knee from further injury. One issue of fact for the ALJ, therefore, was whether the right knee was vulnerable to reinjury or aggravation. The ALJ's finding that the right knee was in fact predisposed to further injury is material to the credibility of claimant's explanation that he injured his left knee because he guarded his vulnerable right knee from reinjury.

We next consider Argonaut's argument that claimant is precluded from recovery because this case does not fit within any of the recognized categories of compensable consequences defined by Professor Larson. In his treatise on workers' compensation law, Larson has classified compensable consequence cases into three categories. *See* Larson, *supra,* §§ 13.11(a) to 13.14, at 3–502 to 3–574. The first category is comprised of cases where the industrially injured part of the body later develops medical complications. *Id.* § 13.11(a), at 3–503 to 3–522. The second category includes cases where the existence of the primary compensable injury exacerbates the effects of an independent medical condition or disease. *Id.* § 13.11(b), at 3–523 to 3–535. The third category is made up of cases involving miscellaneous consequences of a compensable injury. *Id.* § 13.11(c), at 3–535 to 3–541. Larson subdivides these cases into cases where industrial injuries cause later falls or other accidents resulting in additional injuries, *id.* § 13.12(a), at 3–546 to 3–553, and cases where later accidents result in further injury to the predisposed part of the body, *id.* § 13.12(b), at 3–553 to 3–558.

Argonaut further argues, and we agree, that prior Arizona decisions have fallen within these recognized categories. *See, e.g., Lou Grubb* (later injury to predisposed wrist); *Klosterman v. Industrial Comm'n,* 155 Ariz. 435, 747 P.2d 596 (App.1987) (later injury to predisposed knee); *Mercante v. Industrial Comm'n,* 153 Ariz. 261, 735 P.2d 1384 (App. 1987) (later medical complication of industrial back injury); *Dutton v. Industrial Comm'n,* 140 Ariz. 448, 682 P.2d 453 (App.1984) (later injury to predisposed back); *O'Donnell v. Industrial Comm'n,* 125 Ariz. 358, 609 P.2d 1058 (App.1979) (industrial knee injury caused later back injury); *American Smelting and Ref. Co. v. Industrial Comm'n,* 25 Ariz.App. 532, 544 P.2d 1133 (1976) (industrial leg injury caused medical complication of nonindustrial kidney condition); *Carabetta v. Industrial Comm'n,* 12 Ariz.App. 239, 469 P.2d 473 (1970) (industrial injury caused later fall resulting in additional injuries).

■ Although we agree that this case does not fall within any of the above recognized categories, we disagree that such categories exclusively determine whether a later injury is within the range of compensable consequences of an industrial injury. First, we have previously stated that questions of causation are "best left to be decided on the individual facts of each case as they arise." *Mercante,* 153 Ariz. at 265, 735 P.2d at 1388 (citing *Dutton,* 140 Ariz. at 452, 682 P.2d at 457). Second, our most recent opinion regarding compensable consequences noted that "[t]he limits of the phrase 'direct and natural result' are not defined in Arizona." *Lou Grubb,* 174 Ariz. at 26, 846 P.2d at 839. Thus, in *Lou Grubb,* we rejected Argonaut's argument that the determination of legal cause hinged upon whether third-party negligence was necessarily a superseding cause of the claimant's injury. *Id.* at 28, 846 P.2d at 841. Instead we decided whether, under the circumstances, the causal relationship was substantial enough as a matter of policy to make the later injury the legal consequence of the industrial injury. *Id.* at 27, 846 P.2d

at 840. We conclude that this is the proper legal test that applies when, as here, the case does not fall within a recognized category of direct and natural results.

Argonaut cites three Arizona cases in support of its position that claimant's left knee injury is not compensable.[2] Argonaut's argument, however, misses the point of our holding in *Lou Grubb*. Under *Lou Grubb*, a claimant must establish that the later injury is (1) medically connected to the work injury and (2) the relationship is substantial enough as a matter of policy that the later injury is the legal consequence of the industrial injury. *Id.* at 28, 846 P.2d at 841. Thus, although a medical link is not the only element necessary to establish that a later injury is within the range of compensable consequences of a work injury, it is a required element. Where the medical evidence found by the ALJ establishes the absence of a causal connection between the work injury and the later injury, a claimant has failed to prove causation.

Each of the three cases cited by Argonaut in support of its argument involves a failure by a claimant to prove a required element of causation—a medical connection between the work injury and the later injury. *See East,* 137 Ariz. at 317, 670 P.2d at 422 (sufficient medical evidence existed to support conclusion that industrial injury did not cause later shoulder instability); *Miller,* 114 Ariz. at 450–51, 561 P.2d at 774–75 (sufficient medical evidence existed that weakened leg resulting from industrial injury was wholly unrelated to later fracture in auto accident); *Payton,* 27 Ariz.App. at 95, 551 P.2d at 85 (insufficient medical evidence existed that industrial injury contributed to later accident or additional injury).

■ Here, because the ALJ found that claimant's medical evidence supported the conclusion that the industrial injury was the cause of claimant's left knee injury, the above cases cited by Argonaut are not dispositive. The ALJ's findings of fact must be reviewed in a light most favorable to sustaining the award. *Anton v. Industrial Comm'n,* 141 Ariz. 566, 569, 688 P.2d 192, 195 (App.1984).

If a conflict in the medical evidence exists, it is the responsibility of the ALJ to resolve it. *Stainless Steel Specialty Mfg. Co. v. Industrial Comm'n,* 144 Ariz. 12, 19, 695 P.2d 261, 268 (1985). The ALJ resolved the conflict in the medical evidence by accepting Dr. Krigsten's opinion that the left knee injury was causally related to the industrial injury. The record supports these findings. Thus, claimant established a medical connection between the industrial injury and the left knee injury.

Claimant argues that *Carabetta v. Industrial Comm'n,* 12 Ariz.App. 239, 469 P.2d 473 (1970), a case "directly in point," compels the conclusion that claimant's work injury to his right knee contributed to his left knee injury. We disagree that *Carabetta* is dispositive of this issue. There, the industrial knee injury caused instability, which in turn caused the claimant to fall and suffer injuries to other parts of his body. In holding that the new injuries were compensable consequences of the industrial injury, the court stated:

Under the circumstances here involved, there being no evidence of any negligent conduct or fault on the employee's part which led to the subsequent injury, it is well established that where a weakened member such as a leg *contributes to a later fall or injury, such later fall or injury* is a compensable consequence of the prior industrial injury.

*Id.* at 241, 469 P.2d at 475 (emphasis added).

Claimant implicitly argues that because the industrially injured right knee contributed to the left knee injury, the above quoted language from *Carabetta* directly supports the award in the current case. We disagree. The holding in *Carabetta* is confined to cases in which the industrial injury itself *causes* a later fall. All of the authority cited in *Carabetta* is similarly limited. The court's use of language that may apply beyond the facts of the case is dicta. *See, e.g., Town of Chino Valley v. City of Prescott,* 131 Ariz. 78, 81, 638 P.2d 1324, 1327 (1981). Here, because claimant's trip and fall was not caused by the

**2.** *East v. Industrial Comm'n,* 137 Ariz. 315, 670 P.2d 420 (App.1983); *Miller v. Industrial Comm'n,* 114 Ariz. 449, 561 P.2d 773 (App.1977);

*Payton v. Industrial Comm'n,* 27 Ariz.App. 92, 551 P.2d 82 (1976).

industrially predisposed right knee, *Carabetta* is not applicable.

In *East*, however, we also addressed the issue whether the link between the industrial injury and the later injury was strong enough that the industrial injury was the legal cause of the later injury. There, the claimant had twice dislocated his shoulder off work and then dislocated it at work. Following the industrial injury, surgery stabilized the condition until the claimant reinjured the shoulder four years later in a serious automobile accident. Surgery was again required, but it failed to stabilize the condition. The claimant then petitioned to reopen, claiming that the current instability was a direct and natural result of his prior industrial injury. *East*, 137 Ariz. at 316, 670 P.2d at 421. The court rejected this argument because

> [t]here is no testimony that the present instability is a direct and natural result of the 1971 [industrial shoulder] injury. Rather, the testimony supports the conclusion that the direct and natural result of the 1971 accident was a stabilized shoulder which ... would have continued in that condition but for the intervening auto accident. Moreover, the 1971 injury played no role in causing the accident to occur. Under these circumstances, ... [the] new injury cannot legally be the consequence of the original injury.

*Id.* at 317, 670 P.2d at· 422 (dictum).

Here, the relationship between the two injuries is stronger than in *East*. There, the shoulder was stable after the first shoulder surgery for several years, the industrial injury was only one among several causes of the later instability, and the intervening accident was both unrelated to the industrial injury and severe. In contrast, in this case claimant consciously protected his industrially injured right knee by landing on his left leg. Furthermore, given the ALJ's acceptance of Dr. Krigsten's opinion, this event caused an acute injury to the left leg.  ·

We believe the only conclusion one can reach from this record is that the work injury is the legal cause of the later left knee injury. Had Argonaut disputed claimant's credibility with evidence that anyone who

trips with one leg and is about to fall will naturally place full weight on the opposite leg whether recuperating from a knee injury or not, we would have been constrained to support an award of no compensability. But Argonaut never questioned the credibility of claimant's testimony that he injured his left knee while *consciously* attempting to protect his industrially injured right knee from reinjury. Furthermore, Argonaut has not challenged the ALJ's finding that "[claimant's] statement that he tried to protect the right knee was not contradicted by any other witness, expert or otherwise, and therefore, it was found to be credible." Thus, applying the proper test of causation announced in *Lou Grubb*, we conclude that a substantial causal relationship exists "between the industrial injury and the later disability or need for treatment." *Lou Grubb*, 174 Ariz. at 26, 846 P.2d at 839.

We are not persuaded by Argonaut's argument that as a matter of law legal causation does not exist here because claimant's industrially injured right knee had nothing to do with the initial trip and fall. Had claimant chosen not to protect his industrially injured, vulnerable right knee, he might have sustained further injury to it. In that event, this case would fit squarely within those Arizona authorities holding that where claimant's conduct is reasonable, a later injury to the predisposed part of the claimant's body is a compensable consequence of the industrial injury. *See, e.g., Klosterman.* Under these particular facts, to preclude claimant from obtaining benefits for the left knee injury would penalize him for what is, in effect, his effort to mitigate the damages to his industrially injured right knee.

## III.  CONCLUSION

We hold that although the ALJ applied the wrong causation test, under the right test this record supports only one conclusion. The relationship between the industrial injury and the later left knee injury is substantial enough that the left knee injury is within the range of compensable consequences of

the industrial injury. For the above reasons we affirm.

EHRLICH and NOYES, JJ., concur.